**XANADU MARITIME TRUST and Phil Graf, Petitioners in Limitation,**

v.

**Herbert M. MEYER and Barient Company, Ltd., Claimants.**

**No. C–94–0528 WWS–MMC.**

United States District Court, N.D. California.

Oct. 13, 1998.

James P. Caiopolous, James P. Caiopolous & Associates, Orange, CA, Brian S. Kreger, Lamberto & Kreger, Palo Alto, CA, for Petitioners.

Frank B. Hugg, San Francisco, CA, for Claimants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SCHWARZER, Senior District Judge.

This is a Petition in Limitation brought by petitioners XANADU Maritime Trust and Phil Graf against claimant Herbert Meyer, plaintiff in the underlying personal injury action. The parties stipulated to have liability adjudicated in this action. The case went to trial before the court on September 28 and concluded on October 2, 1998. Following the presentation of evidence, closing arguments by counsel were heard by the court. These are the court's findings of fact and conclusions of law.

### BARIENT'S RULE 52(c) MOTION

The court has heretofore granted Barient's motion for judgment as a matter of law pursuant to Rule 52(c), made at the close of claimant's case. Meyer claims that the Barient 28 winch installed on XANADU was defectively designed. He contends that the design defect permitted the winch to be assembled with one or both of its ratchet gears inverted, and that in that condition, which could not be detected from the winch's external appearance, the pawls may not engage the ratchet properly, permitting the ratchet to slip and the winch to fail unexpectedly.

There is no evidence that at the time of the accident on July 31, 1993, one or both of the gears in XANADU's primary portside winch was inverted. The only evidence in the case is that the winch functioned without problem all of that day while the vessel was underway and it was in use, and for all the time the vessel was owned by petitioner Graf. There is no evidence that the winch had ever failed or had ever been improperly assembled. When the winch was disassembled in 1995, the gears were found to have been properly installed.

Because the court concludes that claimant has failed to prove the existence of a defect in the winch on the day of the accident or, for that matter, of a malfunction of the winch, Barient is entitled to judgment.

■ The court would be remiss, however, were it not to note the misconduct of the witness Robert Keefe and the unprofessional conduct of claimant's counsel, Frank Hugg. Through the witness Keefe, a former Barient executive, Hugg sought to prove that when one of the ratchet gears in the winch is inverted during installation, the winch appears to be functioning normally but can fail at any time because the pawls will not seat properly in the pockets of the ratchets. Keefe testified that he had tested the winch and determined that when one of the gears is inverted, the winch appeared to be functioning normally but could at any time fail under load without warning. On cross-examination, he affirmed that in his tests, aside from intentionally inverting the ratchet gear for testing purposes, he had assembled the winch in the way he normally would if he were going to use it.

Barient produced expert witness Brad Wong who demonstrated that when the winch is properly assembled but with one of the gears inverted, it would bind and could not be operated at all. Hugg then produced Keefe on rebuttal who assembled a winch to demonstrate that it would not bind and could be operated with an inverted gear. However, Keefe failed to tighten the bolts as they would be tightened in normal and proper assembly pursuant to the manufacturer's directions. This left a gap between the housing and the gears, enabling them to rotate. Keefe concealed this fact until confronted by opposing counsel.

When later asked by the court to explain, counsel admitted that he had been nervous before trial about presenting this testimony at all and had no explanation for how he

could have offered Keefe's testimony on rebuttal when he suspected[1] that it was false and would mislead the court about a material fact. The misrepresentation to the court of a crucial fact obviously known to Keefe with many years of experience with Barient winches is a violation of his oath to tell "the whole truth." And it is a grave breach of professional ethics on Hugg's part to present expert testimony knowing or suspecting it to be false and misleading in the absence of full disclosure of the manner in which the test was conducted.[2]

## SEAMAN STATUS

■ Claimant Meyer claims to be a seaman entitled to recover under the Jones Act. Because the court concludes that petitioners were not negligent, even in the slightest degree, it is not necessary to belabor this point. Suffice it to say that prior to the accident claimant spent only a small fraction of his time sailing XANADU and performing related shoreside maintenance activity. Over the two-year period leading up to the accident, he had been out on XANADU not more than half a dozen times. He was one of a number of persons on whom Graf called to crew the vessel. Claimant had no standing arrangement or commitment to crew. Under *Chandris, Inc. v. Latsis,* 515 U.S. 347, 368, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995), to be a seaman, a person must have a connection to the vessel that is "substantial in terms of both its duration and nature," i.e., more than transitory and sporadic. The rationale is that the benefits of the Jones Act are extended only to persons who in their work are regularly exposed to the perils of the sea. *See id.* Meyer's connection to XANADU did not reach that level. That Graf may have promised to include him in a trans-Pacific voyage sometime in the future does not alter that fact. The Ninth Circuit's decision in *Boy Scouts of America v. Graham,* 86 F.3d

1. In colloquy with the court, Hugg stated, "I had a suspicion that the base plate was backed off," and admitted that he did ask Keefe before recalling him for rebuttal how Keefe could make his theory work after it had been demonstrated to be false by Wong.

2. *See* Cal.Bus. & Prof.Code § 6068(d) ("It is the duty of an attorney ... [t]o employ, for the

purpose of maintaining the causes confided to him or her such means only as are consistent with truth, and never to seek to mislead the judge...."); Model Rules of Professional Conduct Rule 3.3(a)(4) ("A lawyer shall not knowingly ... offer evidence that the lawyer knows to be false."). *See generally,* William W Schwarzer, *Ethics and the Expert Witness,* 2 Shepard's Expert & Sci. Evidence Q. 587 (1995).

861 (9th Cir.1996), does not help claimant. The issue here is not whether Meyer's duties contributed to the accomplishment of XANADU's mission—a fact that may be conceded. Rather the question is whether his connection to her was sufficient under the *Chandris* standard. With respect to that issue, *Graham* held only that whether the requisite connection to the vessel existed is one of fact. *See id.* at 866. Because claimant's connection to XANADU was not substantial in terms of its duration or nature, claimant is not a seaman. Accordingly, the court concludes that the relevant standard is reasonable care under the circumstances, as stated in *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 630–32, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959) (holding that a shipowner owes a social guest the duty of exercising reasonable care under the circumstances).

## NEGLIGENCE CLAIM

■ On July 31, 1993, claimant was severely injured on board the fifty-foot yawl XANADU while engaged in easing the sheet to the genoa foresail that XANADU was then flying. The accident occurred at about 4:00 p.m. while XANADU was several hundred yards offshore approaching San Francisco's Pier 39. No one observed the entire accident other than claimant, and his ability to observe it fully was impaired by the traumatic event itself.

According to claimant, he had removed the genoa sheet from the portside cleat with his left hand, holding it with his right hand preparatory to easing the sheet. He then grasped the sheet with both hands, standing in the cockpit with the right foot on the cockpit deck and the left foot or knee on the bench. He leaned back against a stanchion, holding the sheet tightly in both hands. The winch had four or five wraps of sheet on it. He then tried to ease the line by cracking it slightly, moving his arms forward to allow it to slip around the winch. The line appeared to be stuck. Next he heard a groan, his arms were yanked and he was pulled toward the winch, hitting his head against the corner of the doghouse. There was no load on the line before it slipped, the only tension on it being the force applied to it by claimant leaning back from the winch. It is possible

that in the process claimant attempted to remove a wrap but at trial he denied having done so.

It is beyond dispute that the procedure used by claimant was improper and unsafe. The witnesses agreed that to ease the foresail safely, the person must ensure that friction is maintained between the sheet and the winch drum at all times. That is normally accomplished by pressing with one hand on the wraps on the drum while maintaining a load on the free end of the sheet and then releasing the sheet gradually and under control. Claimant's position leaning backward near the center of the cockpit a couple of feet from the winch made it impossible for him to place his hand against the wraps on the winch. In addition, by moving his arms toward the winch as he tried to ease the sheet, claimant failed to maintain a load on the sheet and at least momentarily allowed the sheet to sag and friction to be lost. This allowed the sheet to slip and go to full load instantaneously. The testimony is that this is not an uncommon occurrence for sailors both experienced and inexperienced. The consequences of this sudden release were aggravated by claimant's failure to immediately release his grip on the sheet so as to permit it to run freely. It was because he maintained his grip that he was propelled forward. The court finds that it is more probable than not that this is how the accident occurred.

Accordingly, the court finds and concludes that the most probable cause of the accident was claimant's own negligence. The question then arises whether under the comparative negligence rule petitioners can be charged with negligence constituting a contributing cause. Claimant has advanced a number of theories which will be taken up seriatim.

According to claimant, the core of his case is that Graf's use of a three-quarter inch Samson-weave sheet on the Barient 28 winch was below the standard of care. Paul Kamen, a naval architect and witness for claimant, testified that the appropriate size sheet for the Barient 28 was one-half inch, not the three-quarter inch used. He explained that it is more difficult to get consistent friction with an oversized sheet because it does not

like to bend around a relatively tight radius, which "seems to affect its ability to grip the drum" and makes it more likely to roll over the top retaining lip of the winch drum.

There is no evidence that the use of a three-quarter inch rope on the Barient 28 created any irregularity in the friction between the sheet and winch or other problem during the sail that day or at any time prior to the accident. Jocelyn Nash, a sailmaker and witness for petitioners, testified that she had sailed XANADU in a race using a sheet that size without difficulty. Photographs and in-court demonstrations showed the winch to accommodate four to five wraps of the sheet comfortably. Nash and Paul Miller, a doctoral candidate in marine technology and also a witness for petitioners, testified that a sheet is appropriately sized if it allows for sufficient number of wraps around the winch and that a three-quarter inch sheet, making four to five wraps around the Barient 28, creates sufficient friction to hold the sheet. Indeed, the only time slippage occurred was when Meyer himself held the sheet and moved his arms forward to release tension. Thus, Meyer, and not the sheet size, caused the unpredicted release of friction. Moreover, Meyer, who provided a precise description of the winch at the time of the accident, never mentioned that any wrap was rolling off the lip of the drum.

Claimant amplifies this claim by contending that he lacked sufficient competence to perform the operation of easing the sheet under the conditions prevailing at that time. Yet claimant, who has considerable sailing experience on large and small boats, does not deny that he had handled winches and trimmed and eased the genoa on XANADU, and he so testified at trial. He had also handled jibs, set the spinnaker and changed the headsail, and he had crewed on XANADU in one race. Graf, who without question is an experienced sailor, testified that he considered claimant to have experience with the genoa and thought he was a very good sailor. Claimant himself testified that Graf considered him a pretty good sailor and would legitimately have confidence in his ability to trim and ease sheets. Thus, the evidence fails to establish by a preponderance that Graf had reason to believe that claimant was not competent to ease the genoa sheet at that time and was negligent in permitting him to perform this operation.

Nevertheless, claimant contends that the conditions prevailing at the time created an unreasonable risk of harm for one in claimant's position and with his experience. It is agreed that easing the sheet can be hazardous and the conditions under which it is performed have an impact on the degree of hazard. The wind at the Golden Gate Bridge at the time was about fifteen miles per hour with gusts to twenty miles per hour and probably somewhat less closer to land on the approach to Pier 39. According to Kamen, claimant's own witness, it was a normal summer day. There were no hazardous wind, weather or tidal conditions. The preponderance of the evidence establishes that the planned downwind drop of the sail was a safe maneuver. While the boat was approaching the breakwater at seven knots and was within a few hundred yards, Meyer did not testify that he felt under any pressure as he prepared to ease the sheet. Thus, claimant has failed to show that Graf was negligent in directing or permitting Meyer to ease the genoa sheet under the prevailing conditions.

At various times during the trial claimant advanced a variety of other theories none of which, however, support a finding that petitioners contributed to the accident by failing to adhere to the standard of care.

Claimant has contended that the winch failed, i.e., that it suddenly released, because it was negligently maintained by being excessively greased. Grease in the ratchet pockets could prevent the pawls from seating properly. As previously noted, there is no evidence of the internal condition of the winch at the time of the accident or that it had failed then, or ever. Moreover, claimant's testimony that he heard a groan just before the accident is consistent with his statement that the sheet appeared to be stuck and confirms that the winch was holding.

Claimant contends that the genoa sail was too large for the conditions that day and for the winch. Keefe and Kamen's testimony that the sail was too large is refuted by Nash and Miller, both of whom considered the sail appropriate. Nash, the only witness quali-

fied to do so, calculated the load on the sail at the time of the accident to have been between 700 and 2,100 pounds, well below the 2,800–pound limit of the winch. Had the sail been excessively large, generating too much power, it would have caused steering and handling difficulty and excessive heeling. There is no evidence that any difficulty was encountered that day, considering particularly that much of the time the inexperienced visitors on board were able to steer the boat and trim the sails without difficulty.

Keefe testified that the absence of lifelines on XANADU made it unsafe. His testimony, which is entitled to little weight, was refuted by expert witness Miller who was considerably more knowledgeable and experienced. He explained that because of the relatively greater stability, slower acceleration and deeper cockpit, compared to modern, high speed sail boats, lifelines are not required for safe operation on XANADU, especially for sailing within the bay. Although Kamen argued that lifelines would have contributed to a greater sense of security on claimant's part in performing the maneuver, it has not been shown that he could not safely and comfortably ease the sheet from his position deep in the cockpit.

Keefe claimed that proper rigging required use of a foot block for the genoa sheet. But both Nash and Miller stated that a foot block is necessary only when there is a risk of override on the winch drum and, in the case of XANADU, use of the fair lead did not cause override. Even if the sheet had been led through a foot block, the force exerted would have been the same and it is pure speculation that claimant's negligence would have resulted in lesser injury. His assertion that an aft winch should have been used was refuted by Miller who stated that it would be used only in races with a large crew; in cruising, a captain wants to have lines in close proximity to him in the cockpit.

Claimant makes generalized claims that the presence of the guests somehow interfered with safe operation and that there was an insufficient crew on board. There is no indication that the presence of the guests in any way contributed to the accident. XANADU has historically been sailed with a two-person crew.

Accordingly, the court finds and concludes that claimant failed to sustain his burden of showing by a preponderance of the evidence that petitioners' conduct fell below the standard of reasonable care under the circumstances. Judgment for petitioners with costs.

IT IS SO ORDERED.