MAIN, Justice.
Groton Pacific Carriers, Inc. (“Groton Pacific”), and International Tanker Management Holding LTD. (“ITM”) appeal from a judgment in the amount of $4,851,125 entered in favor of Carl Jackson, as personal representative of the estate of Carl L. Williams, deceased, and as next friend of Camren Lamarcus Williams, Jayden Eugene Williams, and Cartez La-bruce Williams, minors; and Edward L. Purdue. We reverse and remand.
I. Facts and Procedural History
This appeal arises from an accident that occurred on the Mobile River. Purdue and Williams were working for Mo-Bay Shipping Services, Inc. (“Mo-Bay”), as line handlers. Mo-Bay provides line-handling services to vessels docking and undocking at various terminals in the Port of Mobile. Mo-Bay’s line handlers retrieve the mooring lines from vessels and secure the lines to shore-side bollards or offshore mooring dolphins.[1] Although Mo-Bay’s line-handling services are typically performed by employees working dockside, its operation often requires the use of small boats to run out to retrieve the mooring lines from a vessel and then to transport and secure the lines to mooring dolphins or shore-side bollards. Mo-Bay maintains a small fleet of two-man motorized 17-foot boats for use in its line-handling services.
Purdue and Williams sometimes worked on these line-handling boats. On June 19, 2008, they were dispatched by Mo-Bay to meet the MT Glenross, an ocean-going tanker; they were to use a Mo-Bay boat to transport the Glenross ⅛ steel mooring lines from where the Glenross was anchored to shore-side bollards located a few hundred yards away. The accident occurred while Purdue and Williams were handling one of the Glenross’s mooring lines. The mooring line, a steel cable, was lowered to Purdue and Williams, who secured the line to the Mo-Bay boat. After the line was secured to the boat, Williams yelled up for the Glenross’s crew to let out more slack so the boat could pull the line toward shore. Rather than more line letting out, however, the line began to “heave in” or retract. As a result of either a mechanical problem with the ship’s winch or improper operation of the winch by the Glenross’s crew, the mooring line continued to be reeled in, and the boat Williams and Purdue were in, which was connected to the line, was pulled out of the water and up the side of the Glenross ⅛ hull. Williams and Purdue held onto the boat as it was lifted from the water. The boat, however, broke free from the line, fell into the river, and capsized. Williams and Purdue, who were not wearing life vests, fell into the water. Purdue was able to climb atop the capsized boat and was rescued. Williams, who could not swim, drowned.
On October 28, 2008, Purdue and Jackson, as personal representative of Williams’s estate and as next of friend of Williams’s minor children, filed this action in the Mobile Circuit Court. The complaint named Purdue and Williams’s employer, Mo-Bay, as a defendant. The complaint also named the Glenross’s managers, Groton Pacific and ITM, and its *600 owner, Cypress Glennross, LLC (“Cypress”), as defendants.
Count one of the complaint alleged that Purdue and Williams were “Jones Act seamen” and asserted a Jones Act, 46 U.S.C. § 30104, claim against Mo-Bay. The complaint asserted that Mo-Bay had failed to provide appropriate safety equipment, including life preservers and safety devices designed to release an attached mooring line from the line-handling boat before the boat is picked up from the water. Count one additionally alleged general maritime-law claims of negligence and unseaworthiness against Groton Pacific, ITM, and Cypress. Count one also made an alternative claim that Purdue and Williams were longshoremen and/or harbor workers entitled to recover from Groton Pacific, ITM, and Cypress under the Longshore and Harbor Workers’ Compensation Act (“the LHWCA”), 38 U.S.C. § 901 et seq.
Count two of the complaint asserted claims under Alabama law, including a wrongful-death claim. The complaint conceded that the claims in count two were made to preserve those claims “[i]n the unlikely event that the Court should decide that these claims do not fall within the maritime and admiralty jurisdiction of the United States.” Count two was voluntarily dismissed before trial.
Mo-Bay denied that Purdue and Williams were Jones Act “seamen” and moved for a summary judgment, arguing that Purdue and Williams were instead harbor workers covered by the LHWCA and thus unable to sue Mo-Bay because harbor workers may recover only compensation benefits from their employer. In support of its motion for a summary judgment, Mo-Bay submitted the affidavit testimony of the president of Mo-Bay, William Lott. Lott testified regarding the duties of Mo-Bay’s line-handling personnel and also testified specifically regarding Purdue’s and Williams’s work for Mo-Bay. Lott testified, in part:
“4. Typically, Mo-Bay is contacted by the agent for an incoming or outgoing vessel and is informed of how many, at what time and at what location line handlers are needed for docking or un-docking. Mo-Bay then contacts its line handlers and instructs them to report to said location at said time in order to perform the line handling. In some instances, the line handlers report to Mo-Bay’s office where a van will transport the workers to the specified dock....
“5. Certain terminals in the Port of Mobile have positioned some of their mooring bollards, not on shore, but on top of mooring dolphins located a short distance from the shore.... While some of these dolphins are so near the shore that they could be accessed by a line handler from shore, the normal practice is to put two or three line handlers in a small line handling boat, but then drive out to the dolphin_Once at the dolphin, one of the line handlers will then climb onto the dolphin while the other line handlers will receive the ship’s lines and transport them to the dolphin where the lines are secured to the bollard by the line handler on the dolphin.... On this type of job, another Mo-Bay crew of line handlers will also be simultaneously handling lines on the dock.
“6. On each job, whether a particular line handler is assigned to work with the shore side crew or with a line handling boat crew is left completely up to the Mo-Bay management or the men working that specific job. No line handlers are ‘assigned’ as crew members of a line handling boat and each individual line handler is subject to being put on the shore or in the line handling boat.
“7. If required to work from a line handling boat, on average, and including *601 the travel time from shore to the vessel and back, line handlers would spend approximately one to one and one-half hours in the line handling boat. If, on a particular job, a line handler was assigned to work from the mooring dolphin, he would then only spend the travel time in the boat. These line handlers were never required to work beyond the confines of The Mobile River or terminals located along Mobile Bay.
“8. At no time are any line handlers required to sleep or eat their meals aboard a line handling boat. Each line handler is free to return to his home or desired destination at the completion of each line handling job. Furthermore, none of the line handlers are required to have seaman’s papers, a Coast Guard license, or sign any ship’s articles. Finally, none of the line handlers at Mo-Bay are designated as crew members of any line handling boat.
“9. One of Mo-Bay’s employees, Edward Purdue, has been employed with Mo-Bay for approximately thirteen (13) years. Purdue’s years of experience at Mo-Bay have led to his status as a somewhat ‘senior’ employee in terms of his experience and responsibilities. During that time, the majority of Purdue’s work has involved crew transportation/delivery jobs and on shore mooring jobs. Purdue typically received instructions from his shore side supervisors at Mo-Bay as to what transportation/delivery or line handling jobs he would need to perform on a given day. On certain irregular and sporadic occasions, Purdue was required to work a line handling boat on the mooring dolphin jobs. Whether or not Purdue was needed to work the line handling boat on a mooring dolphin job was completely dependent upon the, particular needs that a given terminal or incoming/outgoing vessel may have on a particular day as well as on what other available line handlers were available to work for Mo-Bay on that given day.
“10. Another line handler for Mo-Bay was Carl Williams. Carl Williams was a part-time line handler who began his employment with Mo-Bay on May 7, 2007. From May through December of 2007, Williams irregularly and sporadically worked shore side and mooring dolphin line handling jobs for Mo-Bay. Sometimes he would work completely shore side, sometimes in a line handling boat and sometimes from the mooring dolphin. Like Purdue, his work assignments were based on the particular needs that a given terminal or incoming/outgoing vessel may have on a particular day along with the availability of other line handlers at Mo-Bay. From December 28, 2007 until March 16, 2008, Williams did not work at all for Mo-Bay. From March 17, 2008 until the date of this accident, a period of approximately three (3) months, Williams worked irregularly and sporadically, averaging twelve (12) line handling jobs per month.
“11. Typically, Purdue and Williams would be contacted by a line handling supervisor and would be instructed on where to report for a job. When required to work in a line handling boat, they would then travel to the jobsite, prepare the line handling boat for the job, launch the line handling boat, ride in the line handling boat to the vessel or dolphin, perform the job (which often times included getting out of the boat and working from a mooring dolphin or getting out of the boat to reach an on shore bollard) and then ride in the boat back to shore.
“12. Purdue and Williams both received their instructions from a shore-side dispatch for Mo-Bay. There was *602 no set schedule by which line handlers worked from. Their job assignments were completely based upon the various needs and times that vessels would arrive into the Port of Mobile and upon the decisions of Mo-Bay.”
Mo-Bay asserted that because Williams’s and Purdue’s use of the line-handling boats was only irregular and sporadic, they did not qualify as “seamen” entitled to bring a Jones Act claim.
Jackson and Purdue opposed Mo-Bay’s summary-judgment motion and argued that there was a question of fact as to whether Williams and Purdue were to be properly classified as “seamen” entitled to bring a Jones Act claim against Mo-Bay or whether they were to be classified as “harbor workers,” whose sole remedy against Mo-Bay was compensation benefits under the LHWCA. Although Jackson and Purdue conceded that a recovery under the Jones Act and a recovery under the LHWCA were mutually exclusive, they contended that they were entitled to assert both claims in the alternative and allow the jury to determine under which act they were due recovery. In response to Mo-Bay’s assertion that their work on the boats was irregular and sporadic, Jackson and Purdue presented evidence indicating that Williams and Purdue worked regularly on the line-handling boats. Indeed, they submitted summaries of Mo-Bay’s job tickets that showed that during the year preceding the accident, Purdue had worked an average of 5 days a week for Mo-Bay, and had performed 470 line-handling jobs. Of those 470 jobs, 214 involved use of a line-handling boat. In other words, 45% of Purdue’s line-handling jobs in the year preceding the accident involved the operation of a line-handling boat. Although Williams had worked only 98 jobs for Mo-Bay in the year preceding the accident, 93, or approximately 95%, of those jobs involved the use of a boat. Purdue testified that he normally used the same line-handling boat. Jackson and Purdue argued that Williams’s and Purdue’s regular work on a vessel, which subjected them to the “perils of sea,” raised a question of fact as to whether they were “seamen” entitled to bring a claim against Mo-Bay under the Jones Act, thus precluding a summary judgment. The trial court agreed and denied Mo-Bay’s motion for a summary judgment.
Following the denial of Mo-Bay’s summary-judgment motion, Mo-Bay and its workers’ compensation insurer reached a settlement with Purdue and Jackson for the payment of workers’ compensation benefits. Before the settlement, Jackson and Purdue had filed a separate proceeding before an administrative law judge with the United States Department of Labor seeking LHWCA workers’ compensation benefits from Mo-Bay and its workers’ compensation insurer. In that proceeding, Mo-Bay, Purdue, and Jackson stipulated in writing that Purdue and Williams were harbor workers, subject to “the exclusive jurisdiction of the [LHWCA] ... for workers’ compensation benefits determination for each injury/death.” The settlement agreement was approved by the administrative law judge by a formal “Decision and Order Approving Settlement.” As a part of the settlement, Purdue and Jackson agreed to voluntarily dismiss their Jones Act claim against Mo-Bay and granted Mo-Bay’s insurer a lien over any recovery they might obtain from Groton Pacific and/or ITM. Groton and ITM were not parties to the settlement agreement or the administrative proceedings in the Department of Labor.
Before the trial in this ease, Groton Pacific, ITM, Jackson, and Purdue each filed motions seeking a ruling from the trial *603 court as to Williams’s and Purdue’s status as seamen.[2] The parties agreed that the classification was important to identifying the types of damages available should Jackson and Purdue prevail at trial. Gro-ton Pacific and ITM argued, in part, that, if Williams and Purdue were classified as “seamen,” as opposed to harbor workers, their claims must proceed as general maritime-negligence claims, which do not permit nonpecuniary damages. As Jackson and Purdue explained in their brief to the trial court:
“It makes a major difference in this case whether these two workers were Jones Act seamen on the one hand, or on the other, harbor workers covered by the [LHWCA]. If the men were Harbor Workers as Mo-Bay and the workers themselves agree they were, then they are entitled to claim from the ship (1) non-pecuniary damage[ ] such as loss of society, and (2) punitive damages. But if they were the Jones Act seamen of Mo-Bay, they are clearly not entitled to claim non-pecuniary damages, and arguably not punitive damages, which are major parts of the claimed damages in this case.”
Thus, although Jackson and Purdue had previously argued in their response to Mo-Bay’s summary-judgment motion that substantial evidence supported Williams’s and Purdue’s classification as “seamen,” in response to Groton Pacific and ITM’s motion for a summary judgment they argued that they were due to be classified as harbor workers. Specifically, they argued that the Department of Labor’s approval of their settlement with Mo-Bay for compensation benefits under the LHWCA constituted a “formal award” of LHWCA benefits that effected a formal adjudication of their status as harbor workers. Although the trial court dismissed the state-law claims and the unseaworthiness claim, it denied Groton Pacific and ITM’s motion for a summary judgment on the remaining claims.
Before trial, the trial court ruled, as a matter of law, that Williams and Purdue were harbor workers. The trial court also denied Groton and ITM’s request that the jury be permitted to determine whether Williams and Purdue were seamen or harbor workers. Upon finding Williams and Purdue to be harbor workers, the trial court ruled that the plaintiffs could recover nonpecuniary damages and punitive damages and charged the jury accordingly.[3] Finally, the trial court denied Groton Pacific and ITM’s request that Mo-Bay, as a settling tortfeasor, be added to the special-verdict form so that the jury could assess Mo-Bay’s percentage of fault for Williams’s and Purdue’s injuries.
The case was tried before a jury between December 3-11, 2012.[4] The jury returned a verdict in favor of Jackson and Purdue; it returned a verdict in favor of Jackson in the amount of $5,081,000, which included $231,000 for lost wages and benefits; $300,000 for physical pain and suffering; $550,000 for mental anguish; $2,250,000 for loss of nurture for *604 Williams’s children, and $1,750,000 in punitive damages, and in favor of Purdue in the amount of $670,500, which included $500 for lost wages and benefits; $20,000 for physical pain and suffering; $250,000 for mental anguish; and $400,000 in puni-
five damages. The jury also found Purdue and Williams guilty of 25% comparative fault. The trial court then reduced the compensatory damages by 25% and entered the following judgments:

Carl L. Williams, deceased

Lost wages and benefits: $ 173,250
Physical pain and suffering: $ 225,000
Mental anguish: $ 412,500
Loss of nurture for children: $1,687,500
Punitive damages: $1,750,000
Total: $4,248,250

Edward L. Purdue

Lost wages and benefits: $ 375
Physical pain and suffering: $ 15,000
Mental anguish: $ 187,500
Punitive damages: $ 400,000
Total: $ 602,875
Groton Pacific and ITM filed a posttrial motion seeking a new trial or, alternatively, a remittitur. In support of their motion for a new trial, Groton Pacific and ITM argued that the trial court- had erred in failing to find that Williams and Purdue were seamen or by failing to-submit the seaman-status issue to the jury. Following a hearing, the trial court denied the motion for new trial or for a remittitur. Groton Pacific and ITM appeal.
II. Analysis
On appeal, Groton Pacific and ITM argue that the trial court erred in ruling before trial that Williams and Purdue were harbor workers. Groton and ITM argue that that ruling led the trial court into a number of subsequent legal errors, including incorrectly charging the jury, particularly with respect to the type of damages available, and refusing to allow the jury to apportion any fault to Mo-Bay, Williams’s and Purdue’s employer. Groton Pacific and ITM further argue that the trial court erred in submitting punitive and other nonpecuniary damages to the jury and that the damages awarded are excessive.
We must first determine whether the trial court correctly ruled, as a matter of law, that Williams and Purdue were harbor workers entitled to assert claims against Groton Pacific and ITM pursuant to 33 U.S.C. § 905(b) of the LHWCA. Because only a question of law is presented, our review of this issue is de novo. See Continental Nat’l Indem. Co. v. Fields, 926 So.2d 1033, 1035 (Ala.2005) (“[W]e review de novo the trial court’s interpretation of statutory language and ... previous caselaw on a controlling question of law.”).
The LHWCA was created to establish a compensation scheme for injured maritime workers. An injured longshoreman or harbor worker may bring an action under the LHWCA against his or her employer for workers’ compensation benefits, 33 U.S.C. § 904, and against an owner or agent of a vessel for negligence, 33 U.S.C. § 905(b). Under the terms of the LHWCA, however, a person does not qualify as an “employee” entitled to bring a claim under the LHWCA if that person is “a master or member of a crew of any *605 vessel.” 33 U.S.C. § 902(3)(G). The United States Supreme Court has held that the phrase “master or member of a crew” as used in the LHWCA is merely a “refinement” of the of the term “seaman” as used in the Jones Act, 46 U.S.C. § 30104. McDermott Int’l, Inc. v. Wilander, 498 U.S. 337, 348, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991); Southwest Marine, Inc. v. Gizoni, 502 U.S. 81, 87, 112 S.Ct. 486, 116 L.Ed.2d 405 (1991). The Jones Act permits a “seaman injured in the course of employment” to bring suit against his or her employer. 46 U.S.C. § 30104. Although Jackson and Purdue do not assert Jones Act claims against Groton Pacific and ITM, whether Williams and Purdue were “Jones Act seamen” determines whether their negligence cause of action falls under the general maritime law, or ■ whether it may be asserted under § 905(b) of the LHWCA. Thus the seaman-status question is the critical foundational inquiry in this case.
The parties generally agree that the question of Williams’s and Purdue’s status — seaman versus harbor worker — is important in this case because the answer to this inquiry affects the types of damages available. Without wading too deeply into the stormy waters of maritime-damages law,[5] we note that nonpecuniary damages are generally available to harbor workers injured or killed in territorial waters. See Sea-Land Servs., Inc. v. Gaudet, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974). On the other hand, general maritime law does not, in most cases, allow recovery of nonpecuniary damages for the injury or wrongful death of a seaman. See Miles v. Apex Marine Corp., 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). Thus, a plaintiffs status must be decided in order to fix what categories of damages the jury may award.
As the United States Supreme Court has confessed, “[t]he federal courts have struggled over the years to articulate generally applicable criteria to distinguish among the many varieties of maritime workers, often developing detailed multi-pronged tests for seaman status.” Chandris, Inc. v. Latsis, 515 U.S. 347, 356, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). In Frazier v. Core Industries, Inc., 39 So.3d 140 (2009), we detailed the federal statutory history and caselaw giving rise to the Supreme Court’s current two-pronged test to determine seaman status. That test, articulated by the Supreme Court in Chan-dris, provides:
“[T]he essential requirements for sea-man status are twofold. First, ... ‘an employee’s duties must “contribut[e] to the function of the vessel or to the accomplishment of its mission.” ’ ...
“Second, and most important for our purposes here, a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature.”
515 U.S. at 368, 115 S.Ct. 2172 (citations omitted). Moreover, given the questions of fact often involved in determining seaman status, the inquiry is normally one for a jury. See Wilander, 498 U.S. at 355-56, 111 S.Ct. 807.
“The seaman inquiry is a mixed question of law and fact, and it often will be *606 inappropriate to take the question from the jury. Nevertheless, ‘summary judgment or a directed verdict is mandated where the facts and law will reasonably support only one conclusion.’ ”
Harbor Tug & Barge Co. v. Papai, 520 U.S. 548, 554, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997) (quoting Wilander, 498 U.S. at 356, 111 S.Ct. 807). See also Chandris, 515 U.S. at 369,115 S.Ct. 2172.
In this case, Groton Pacific and ITM argue that the trial court incorrectly ruled before trial, as a matter of law, that Williams and Purdue were harbor workers. They argue that the undisputed evidence establishes that Williams and Purdue were “seamen,” or at the very least requires that the question of their status as seamen be submitted to the jury. Jackson and Purdue concede that the evidence in this case normally would create a jury issue. They argue, however, that once their settlement agreement for compensation benefits under the LHWCA was approved by order of an administrative law judge, it became a “formal award” establishing Williams’s and Purdue’s harbor-worker status and that that finding was binding on the trial court.
First, we reject the argument that the settlement agreement between Jackson, Purdue, and Mo-Bay, approved in a proceeding before the United States Department of Labor, bound the trial court to a finding that Williams and Purdue were harbor workers, as a matter of law. In support of their argument, Jackson and Purdue rely on the case of Sharp v. Johnson Bros. Corp., 973 F.2d 423, 426 (5th Cir.1992). In Sharp, an employee was injured while performing bridge-repair work. The employee sued his employer under the Jones Act and filed a claim under the LHWCA. The worker eventually reached a settlement with his employer with regard to his claim for compensation under the LHWCA; that settlement was approved by an administrative law judge of the Department of Labor. The court in Sharp, citing the holding in Southwest Marine, Inc. v. Gizoni, 502 U.S. 81, 91, 112 S.Ct. 486, 116 L.Ed.2d 405 (1991), that an employee who accepts voluntary payments from his employer under the LHWCA without a “formal award” is not barred from pursuing a Jones Act claim against his employer, held that the order approving the settlement constituted a “formal award” that barred the employee from pursuing the Jones Act claim against his employer for the same injuries.
Jackson and Purdue’s reliance on Sharp in this case is misplaced. Sharp stands for the unremarkable principle that once an employee litigates and reaps the benefits of his LHWCA compensation claim against his employer, he cannot then sue his employer as a “seaman” seeking a second recovery for the same injury. 973 F.2d at 427 (“[T]he LHWCA was not intended to be a ‘stepping stone on the way to a jury award.’ ”). In this case, however, Groton Pacific and ITM, alleged third-party tortfeasors, were not parties to the settlement agreement or to the Department of Justice proceeding, and Williams’s and Purdue’s harbor-worker/seaman status is an element of proof required to recover against Groton Pacific and ITM under 33 U.S.C. § 905(b). It would be a gross violation of Groton’s and ITM’s due-process rights to relieve Jackson and Purdue of their burden of proof on an element of their claim and preclude Groton Pacific and ITM from a full and fair opportunity to contest Williams’s and Purdue’s seaman status on the basis of a private settlement agreement and proceeding to which Gro-ton Pacific and ITM were not parties. See Blonder-Tongue Labs., Inc. v. University of Illinois Found., 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). The *607 holding in Sharp, which limits an injured maritime employee’s ability to seek multiple recoveries from his employer for the same injury under mutually exclusive statutes, does not support the offensive application of the collateral-estoppel doctrine urged upon us by Jackson and Purdue. Accordingly, we hold that the Department of Labor administrative law judge’s order approving Jackson’s and Purdue’s settlement for LHWCA compensation benefits did not establish, as a matter of law, for purposes of this case that Williams and Purdue were harbor workers.
Because the Department of Labor proceeding did not establish Purdue’s and Williams’s status as a matter of law, we must apply the two-pronged Chandris test to the facts before us. The Supreme Court has recognized that meeting the first prong of the Chandris test is not an overly difficult task: it need only be established that the maritime employees “do the ship’s work.” 515 U.S. at 368, 115 S.Ct. 2172. The Supreme Court has stated that this threshold requirement is “very broad,” covering “[a]ll who work at sea in the service of a ship.” Id. Applying this “very broad” and inclusive test to the facts at hand, there is at least evidence indicating that Williams and Purdue contributed to the function of the line-handling vessel. Purdue operated the boat and Williams was serving as deckhand — they were doing the vessel’s work.
The second Chandris prong, however, is a more exacting test. To meet this requirement, it must be shown that a maritime employee has “a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and nature.” 515 U.S. at 368,115 S.Ct. 2172.
“The fundamental purpose of this substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea.”
Id. The Supreme Court has explained that this test is “fundamentally status based.” 515 U.S. at 361, 115 S.Ct. 2172. “Land-based maritime workers do not become seamen because they happen to be working on board a vessel when they are injured, and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore.” Id. The crux of the second Chandris prong involves distinguishing land-based from sea-based employees by examining the employee’s activities and duties. Scheuring v. Traylor Bros., Inc., 476 F.3d 781, 786 (9th Cir.2007).
In the present case, there is substantial evidence of Williams’s and Purdue’s sea-based job activities, namely the handling of ships’ lines from aboard a 17-foot boat. Purdue’s job duties included operating the line-handling boat; Williams served as a deckhand, required to fetch a ship’s mooring line and attach it to their small craft to be pulled to shore. The question, however, is not only whether Williams and Purdue had a connection with a vessel or fleet of vessels — clearly they did; the question is, rather, whether that connection was so substantial in duration and nature as to render each of them a “seaman.” Here the evidence in the record is disputed.
Mo-Bay’s president testified that Williams’s and Purdue’s work in the line-handling boats was “irregular and sporadic.” He testified that the majority of Pur *608 due’s duties at Mo-Bay consisted of shore-side transportation and delivery jobs and shore-side line-handling duties. He testified that whether Purdue was needed to work the line-handling boat was completely dependent upon the particular needs of the day and what other personnel were available to work.’ Purdue, on the other hand, testified that he worked on the line-handling boat nearly every day, and he produced a summary of job tickets showing that approximately 45% of the line-handling jobs he performed involved his use of a Mo-Bay boat.
The job-ticket summary also indicates that when Williams worked, he nearly always worked a line-handling job that involved the use of one of Mo-Bay’s boats. However, as Mo-Bay’s president testified, Williams was a ' part-time worker who worked only sporadically for’ Mo-Bay. In the 3 months before the accident, he worked an average of only 12 jobs per month. Mo-Bay’s president testified that “[sjometimes he would work completely shore side, sometimes in a line handling boat and sometimes from the mooring dolphin.” Like Purdue, his work assignments were based on Mo-Bay’s needs for that particular day.
Mo-Bay’s president testified that each line handler would spend no more than an hour to an hour and a half in the boat. Purdue and Williams did not sleep or eat their meals on the boat. They did not have seaman’s papers or a Coast Guard license, nor did they sign any ship’s articles. Mo-Bay did not formally designate Williams or Purdue as members of any crew.
We conclude that the evidence related to Williams’s and Purdue’s seaman status raises a genuine issue of material fact warranting jury consideration.[6] See Delange v. Dutra Constr. Co., 183 F.3d 916 (9th Cir.1999) (holding that whether a barge worker who occasionally performed work typically done by deckhands, securing and stowing cargo, handling lines, and serving as a lookout, was a seaman was a question for jury). Accordingly, we conclude that the trial court erred in ruling as a matter of law that Williams and Purdue were harbor workers.
We reverse the judgment of the trial court and remand the case for a new trial, which should include the submission for resolution by the jury of the issue of Williams’s and Purdue’s seaman status. Because we are reversing the judgment of the trial court, we do not address the issues related to the type and amount of damages awarded by the jury or the issues related to the verdict form.
III. Conclusion
We reverse the judgment of the trial court and remand the case for a new trial.
REVERSED AND REMANDED.
MOORE, C.J., and BOLIN,
MURDOCK, and BRYAN, JJ., concur.

. According to the record, a "bollard” is an iron post firmly fixed in concrete along a wharf, around which to fasten a ship’s mooring lines, and a "mooring dolphin” is an offshore structure for mooring ships.

.Groton Pacific and ITM moved for a summary judgment. As part of their motion, Gro-ton Pacific and ITM sought dismissal of all claims for nonpecuniary damages and punitive damages. Jackson and Purdue opposed the summary-judgment motion and moved for a judgment as a matter of law as to Groton Pacific and ITM's "Jones Act defense.”

. The trial court refused Groton Pacific and ITM’s proposed charges instructing the jury that punitive damages were not recoverable and limiting the recovery to nonpecuniary damages.

. Jackson and Purdue never obtained service of process on Cypress, and Cypress was dismissed from the action before trial.

. For a full discussion of some of the debates concerning maritime damages, see Attilio Costabel, Waiting for Gaudet: Charting A Course After Atlantic Sounding Co. v. Townsend, 24 St. Thomas L.Rev. 502 (2013); Thomas Galligan, Jr., Death at Sea: A Sad Tale of Disaster, Injustice, and Unnecessary Risk, 71 La. L.Rev. 787 (2011); and David Robertson, Punitive Damages in U.S. Maritime Law: Miles, Baker, and Townsend, 70 La. L.Rev. 463 (2010).

. Groton Pacific and ITM argue that the evidence demonstrates that Williams and Purdue were seamen as a matter of law and cite the "rule of thumb” approved in Chandris, that "[a] worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman.” 515 U.S. at 371, 115 S.Ct. 2172. They argue that the evidence showing that more than 30% of William's and Purdue’s line-handling jobs involved use of a boat establishes Williams’s and Purdue’s seaman status as a matter of law. We disagree. The 30% rule is "no more than a guideline" to establish who is not a seaman. Id. The facts in this case, including the percentage of time Williams and Purdue spent in service of a vessel in navigation, were sufficiently disputed to present a jury question.