ACCEPTED
01-17-00629-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
5/25/2018 1:21 PM
CHRISTOPHER PRINE
CLERK

# Martin, Disiere, Jefferson & Wisdom L.L.P.

_____ **ATTORNEYS AT LAW** _____

808 Travis Street • 20th Floor • Houston, Texas 77002 • Phone: 713-632-1700 • Fax: 713-222-0101 • www.mdjwlaw.com

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
5/25/2018 1:21:53 PM
CHRISTOPHER A. PRINE
Clerk

Robert T. Owen
PARTNER

Direct: 832-333-1627
e-mail: owen@mdjwlaw.com

May 25, 2018

Christopher A. Prine
Clerk, First Court of Appeals
First Court of Appeals
301 Fannin Street
Houston, Texas 77002-2066
*Via e-file*

> Re:   *Partin v. Superior Energy Services, Inc.*, No. 01-17-00629-CV, In the
>       First Court of Appeals, Houston, Texas

Dear Mr. Prine,

Please distribute this post-argument letter to Chief Justice Radack and Justices Jennings and Lloyd. This letter provides the Court with additional information regarding the factual issues the Court explored with the parties during the May 22, 2018 argument.

***The Record Demonstrates There Are Genuine Issues Of Material Fact On Each Of The Grounds Upon Which The District Court Granted Summary Judgment***

At oral argument, Justice Jennings asked Mr. Tillery to show the Court the "rock solid" evidence conclusively establishing that Superior Energy was entitled to summary judgment. There is no such evidence, and the record demonstrates there are, at the least, genuine issues of material fact regarding the Arctic Challenger's status as a "vessel" and Mr. Partin's status as a "seaman."

1

*The Arctic Challenger's Status As A Vessel*

Mr. Partin suffered his accident in August 2013. *See* CR 115-18, 139. To be entitled to summary judgment on the ground that the Arctic Challenger was not a "vessel," Superior was required to conclusively establish that the Challenger was not a "vessel" on that date. In support of that position, at oral argument Mr. Tillery argued (1) that the Arctic Challenger was incomplete because it had not completed its sea trials and had not been delivered to Shell, and (2) that, even if the Challenger was complete, it had been removed from navigation due to Shell's requests for major modifications.

*The Arctic Challenger Was Complete And Delivered To Its Owner/Operator*

The evidence demonstrates that the Arctic Challenger was "fully operational and functional, and ready to be deployed" in March 2013, after the Challenger received its Certificate of Inspection from the Coast Guard on October 11, 2012 and completed its March 2013 sea trial for the government and Shell. *See* CR 269, 487.

Moreover, because it is undisputed, and indisputable, that Shell did not own or operate the Arctic Challenger (*see* CR 269), Superior's focus on the date the Challenger was delivered to Alaska for use in Shell's Arctic drilling operations is not relevant to the Arctic Challenger's status as a vessel. Indeed, the record establishes that Greenberry Industrial, the contractor charged with constructing the oil containment system for the Arctic Challenger, completed its work in 2012 and delivered the Challenger to Superior, the Challenger's lessor and operator. *See* CR 350-51, 618-19.

*The Arctic Challenger Had Completed Its Sea Trials, Was Fully Functional, And Ready To Deploy*

At oral argument, Mr. Tillery contended that the Arctic Challenger was not a "vessel" because it was still undergoing sea trials in August 2013, pointing to a sea trial occurring in 2015. However, the Superior corporate representatives repeatedly testified that the Arctic Challenger was capable of being deployed following its March 2013 sea trial and that the reason it was not actually deployed was because Shell cancelled the 2013 and 2014 arctic drilling seasons. *See, e.g.,* CR 487, 704. Moreover, as the evidence shows Superior's contracts with Shell required the Arctic Challenger to complete annual sea trials to continue to operate

(*see* CR 768), under Superior's theory the Arctic Challenger would never acquire "vessel" status because there would always be another sea trial required to be conducted in the future.

> *The Arctic Challenger Was Not "Out Of Navigation" At The Time Of Mr. Partin's Accident*

There is also a genuine issue of material fact regarding Superior's position that the Arctic Challenger was taken "out of navigation" at the time of Mr. Partin's accident. Superior's corporate representatives testified that Shell did not ask Superior to take the Arctic Challenger out of "deployable readiness stage" until July 2014, *nearly one year after Mr. Partin's August 2013 accident*. CR 712. Superior's corporate representative also testified the modifications requested by Shell following the March 2013 sea trial were not "major," and again, Superior repeatedly testified that the Arctic Challenger was capable of being deployed after it completed its March 2013 sea trial. *See, e.g.,* CR 487, 491.

Indeed, there is an abundance of evidence in the record showing that the Arctic Challenger qualified as a "vessel" at the time of Mr. Partin's accident. Superior's corporate representatives testified:

Q. What was the deadline [to complete the Arctic Challenger]?
A. I don't recall the exact date, but it was the start of the . . . drilling season in the Arctic. So from the moment we got our certificate of inspection from the Coast Guard [on October 11, 2012], we were eligible to mobilize.

CR 523, 269.

Q. . . . In a general sense, these systems [referencing various systems on the Arctic Challenger] became operational at different points in time; would that be correct? . . .
A. So all of the systems came operational during the construction phase. All of the systems were operational by September 2012.

CR 684.

3

Q. Your testimony is that as of – as of December 2012, the Arctic Containment System was fully functional and could do exactly what it was designed to do; is that correct?
A. Yeah. . . .
Q. But – well, that's to the satisfaction of Shell?
A. That's what I said, yes.

CR 705.

Q. . . . So then you got 12-12 and everything goes smoothly?
A. So we got our stamp from the government in March of 2013.
Q. So when you say "government stamp"?
A. So BSEE [Bureau of Safety and Environmental Enforcement] signed off that the system was operational and met their requirements.

CR 706.

Q. Okay. Is it [the Arctic Challenger] capable of being deployed to an emergency?
A. Yes.
Q. And when did that capability first manifest itself; when was that? What did that first?
A. Well, we got our first Coast Guard certificate of inspection in late 2013.[1] But prior to that, it made several nonresponse deployments. But when we get out certificate of inspection . . . we are deemed ready to deploy to an emergency.

CR 423-24.

Q. When did it [the Arctic Challenger] become fully operational?
A. In December 2012 . . . the dome was damaged. We rebuilt the dome, did a deployment test for Shell, and did that successfully. And then they called off their drilling season, but we demonstrated it for them and BSEE.

CR 704.

_____

[1] Superior's corporate representative misspoke; it is undisputed, and indisputable, that the Coast Guard issued its certificate of inspection on October 11, 2012. CR 269.

Q. Mr. Peyton, earlier, if I understood your testimony, you said that the Challenger was fully operational and functional, ready to be deployed for spills sometime in the 2013, right?

A. Correct. That's correct.

Q. Where there any major modifications to the system after that, after that point in time?

A. I don't know if you would consider any modifications major, but there were modifications made on Shell's request, our customer.

CR 487.

Q. So Shell didn't want it to be deployed until all this stuff [requested modification] was taken care of?

A. No. This was their wish list. They didn't – they would have deployed the vessel without any of this stuff. So it's their wish list. Think of it in terms of if you've got a car, and you were driving it down the road, and you decided you want to put some fancy wheels on it. You can drive it with the old wheels, but you want the shiny ones, so you go out and you do that.

CR 491.

It is Superior's burden to conclusively establish that the Arctic Challenger was not a "vessel" at the time of Mr. Partin's accident. The summary judgment evidence demonstrates, at the very least, there is a genuine issue of material fact regarding that issue, and the district court could not properly grant summary judgment on this ground.

*Partin's Duties & Connection To The Arctic Challenger*

As to Mr. Partin's status, Mr. Tillery contended that there was no evidence in the record that Mr. Partin spent more than 10% of his time working aboard the Arctic Challenger. Counsel further contended that there was no evidence that Mr. Partin's duties contributed to the function of the ship.

5

However, in his deposition, Mr. Partin testified:

Q.      . . . what sort of work did you do at Superior? Did you work on the ARCTIC CHALLENGER or on the ARCTIC CHALLENGER and in the warehouse like you had done previously?

A.      Well, no. I mean, *90 percent of the work was done on the ARCTIC CHALLENGER.*

CR 92 (emphasis added).[2]

Q.      What were your job duties for the one year before your accident with Superior?

A.      Well, I hired on with Superior as a member of the industrial crew. I was a crew member. I was the ship's welder, responsible for – I think the outline of the job was to maintain the vessel and any other vessels in its fleet . . . .

CR 91.

Q.      Beyond in the deployed state getting ready . . . standing by . . . did you have any other tasks related to the operation of the vessel?

A.      I would say no. I was to aid in any way I could basically.

CR 239.

Mr. Partin's testimony conforms with the testimony of Superior's corporate representatives, who testified that Mr. Partin was responsible to (1) "weld on – on the Arctic Challenger" (CR 485-86); (2) "make repairs" (CR 485-86); (3) "secure

---

[2] As the Court will recall from argument, the U.S. Supreme Court instructs that a party who spends less than 30% of his time on board a vessel is generally not a "seaman." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 371, (1995) ("We agree with the Court of Appeals that seaman status is not merely a temporal concept, but we also believe that it necessarily includes a temporal element. A maritime worker who spends only a small fraction of his working time on board a vessel is fundamentally land based and therefore not a member of the vessel's crew, regardless of what his duties are . . . Generally, the Fifth Circuit seems to have identified an appropriate rule of thumb for the ordinary case: A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act.").

items to the deck, making them ready for sea" (CR 485-86); and (4) in the event that the Arctic Challengers' tug's towline was compromised, be "responsible for responding to hook it [the towline] back up and ensure that the vessel didn't founder" (CR 439).

The corporate representatives further testified:

> Q. Was there an assessment by Superior that the Plaintiffs [including Mr. Partin] are all seaman?
> A. They are members of the vessel crew, yes.

CR 430; *see also* CR 640-41 (noting that Mr. Partin was a part of the "vessel crew.").

> Q. . . . did they [a group of plaintiffs, including Mr. Partin] play a big role in navigating, or did they play a big role in transit?
> A. Navigating is a subsector of transit. These folks did not participate in the navigation process. They participated in ensuring the vessel was safe and ensuring the vessel was operational. . . . [T]hey all had a role to play.

CR 432-33.

> Q. And you're saying they're a critical part of what?
> A. The crew, the vessel crew. They play a critical role in the transit of the vessel . . . This vessel cannot go to sea without these people on it, these positions that these people held . . . They have to be on board in order for the vessel to operate.

CR 434.

> Q. So apart from the dewatering, what else did – was essential to the transit of the vessel . . . ?
> A. . . . they would also be responsible for all emergency response on board the vessel such as – and I'm not talking about the emergency response function the vessel services. I'm talking about if there was an emergency that threatened the seaworthiness of the vessel, they would have to respond to that emergency. . . . They are responsible for all of the traditional

7

boatswain mariner type – type duties such as . . . tying, securing things for sea, fastening items to the deck to make sure they don't go flying around. Anchorage; so when it's time to anchor the vessel, they would become heavily involved in that process.

CR 435.

Q. When you say seaworthiness, what do you mean?
A. I mean a situation that if allowed to persist would result in the loss of the vessel. Anything like that, they would address.
Q. Give me an example.
A. . . . so if the vessel were punctured, the hull was punctured and water was coming in, they would be the people to respond to stop the leak and to dewater the vessel . . .
Q. And any other examples of the danger to seaworthiness?
A. If there was a fire that broke out on board in any one of the many machinery paces that these folks are responsible to operate and maintain, they would respond to the fire.
Q. Anything else?
A. . . . if we suffered a stability situation because of improperly loading the vessel, they would be responsible for correcting that stability situation so that the vessel was stable . . . ensuring it's not loaded too much on the port or starboard side.

CR 437-38.

Such evidence, at the least, raises genuine issues of material fact regarding whether Mr. Partin qualifies as a "seaman." *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995) (holding the "employment-related connection to a vessel in navigation" necessary for "seaman" status comprises two elements: (1) "the worker's duties must contribute to the function of the vessel or to the accomplishment of its mission," and (2) "the worker must have a connection to a vessel in navigation . . . that is substantial in both its duration and its nature"). The district court could not have properly granted summary judgment on the ground that Mr. Partin did not qualify as a "seaman."

8

Respectfully submitted,

MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.


By: */s/ Robert T. Owen*
 Robert T. Owen
 State Bar No. 24060370
 *owen@mdjwlaw.com*
808 Travis, 20th Floor
Houston, Texas  77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

**ATTORNEYS FOR APPELLANT
VINCENT PARTIN**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above Letter has been forwarded to opposing counsel via e-filing and e-mail on this 25th day of May, 2018.

| | |
|---|---|
| Lara Pringle | Jefferson R. Tillery, *pro hac vice* |
| *lpringle@joneswalker.com* | *jtillery@joneswalker.com* |
| Jones Walker LLP | Jones Walker LLP |
| 1001 Fannin St., Suite 2450 | 201 St. Charles Avenue, 50th Floor |
| Houston, Texas  77002 | New Orleans, Louisiana 70170-5100 |
| (713) 437-1811 telephone | (504) 582-82338 Telephone |
| (713) 437-1810 facsimile | (504) 589-82386 Facsimile |
| *(via e-File and e-Mail)* | *(via e-File and e-Mail)* |

*(Attorneys for Superior Energy Services, Inc.)*


*/s/ Robert T. Owen*
Robert T. Owen